1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

MICHAEL and JACQUELINE
BONNIFIELD and ANGELA PELFREY,
Petitioners and Next Friends of

ANTHONY PELFREY,

Real Party in Interest,

vs.

GREG LEWIS,

Respondent.

_____/

No. C 12-3857 PJH (PR)

**ORDER DENYING PETITION
FOR WRIT OF HABEAS
CORPUS AND GRANTING
CERTIFICATE OF
APPEALABILITY**

16

17

18

19

20

21

22

23

24

25

26

27

28

    This is a habeas corpus case filed pro se on behalf of state prisoner Anthony Pelfrey

pursuant to 28 U.S.C. § 2254.[1]  The court ordered respondent to show cause why the writ

should not be granted.  Respondent filed an answer and a memorandum of points and

authorities in support of it, and lodged exhibits with the court.  Pelfrey did not file a traverse.

For the reasons set out below, the petition is denied.

**BACKGROUND**

    On May 18, 2009, a court found Pelfrey guilty of attempted murder and two counts of

assault with a deadly weapon and also found that he inflicted great bodily injury in

connection with each count.  Clerk's Transcript ("CT") at 10-12, 18.  On June 10, 2009, the

court found Pelfrey was not legally insane at the time of the offenses.  CT at 33.  He was

_____

    [1] Angela Pelfrey is Anthony Pelfrey's sister and has provided exhibits from his prison
and declarations from doctors indicating that Anthony Pelfrey has a mental disability that
prevents him from prosecuting this action.   A person other than the detained person
challenging his or her detention may file an application for a writ of habeas corpus and
establish standing as a "next friend."  *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990).

sentenced to 13 years in prison.  CT at 52.  On January 10, 2011, the California Court of

Appeal ordered the sentence reduced to 11 years, but otherwise affirmed the judgment and

denied relief in a separate habeas petition.  *People v. Pelfrey*, 2011 WL 63084 (Cal. App. 1

Dist., 2011).  The California Court of Appeal denied a petition for rehearing and the

California Supreme Court denied two petitions for review and a habeas petition.  Answer,

Exhs. 11-19.  The claims in this case were presented to the California Supreme Court in a

habeas petition that was denied.  Answer, Exhs. 17, 19.

The facts, as described by the California Court of Appeal, are as follows:

When a defendant pleads not guilty and NGI [not guilty by reason of
insanity], trial proceeds first on the not guilty plea, with the defendant
conclusively presumed sane at the time of the charged offenses.  (*People
v. Hernandez* (2000) 22 Cal.4th 512, 520.)  If guilt is found, trial continues
on the NGI plea, with commission of the acts conceded and the sole issue
being whether the defendant was sane and thus subject to punishment,
the burden being on him to prove by a preponderance of the evidence
that, at the time of the offense, he was incapable of knowing or
understanding the nature of his act or of distinguishing right from wrong.
(*Id.* at ¶. 520–521.)  In these distinct phases of what is essentially the
same trial (*id.* at p. 521), "the evidence as to each may be overlapping,"
particularly guilt-phase evidence about the defendant's state of mind (*id.* at
p. 520).  Thus, while defendant's only trial claim goes to the sanity phase,
we summarize both phases, to capture overlap from the guilt phase.

**A.  Guilt Phase**

The crimes were seemingly unprovoked knife attacks by defendant on
Murray and Ortiz on July 25, 2007, at property of nonagenarian Henry
(Hank) Erickson at 60 Kunzler Ranch Road in Ukiah, Mendocino County.
It was a compound where residents interacted daily, somewhat like a
family.  Erickson lived in the main house, with people assisting him, and
he rented out other buildings.  Longtime residents Vernon Ketchum and
Hayden McAfee lived in two of the cabins; 3–to–4–year resident defendant
(called "T.J.") lived in another; and for the past year, Ortiz had operated an
auto shop in a warehouse he rented a couple hundred yards behind
defendant's cabin.  Murray was homeless but camped out at some railroad
tracks across a stream near the property.

Eyewitness testimony came from victims Murray and Ortiz, Ortiz's brother
Jose Inez Ortiz Acosta (Acosta), McAfee, and defendant's girlfriend
Katherine (Adrienne) Wilcox, who was at the cabin with him that day.
Defendant did not testify.

Wilcox was defendant's girlfriend.  She got along well with him.  They had
once sought restraining orders against each other but had not followed
through.  Defendant was occasionally jealous.  That past summer, he told
her he was jealous about her and Ortiz but, in fact, nothing had gone on
between Ortiz and herself.  The episode resolved when Wilcox agreed not
to go near Ortiz's shop.  On the day of the attacks, Wilcox was with

2

United States District Court

For the Northern District of California

defendant in his cabin, watching TV.  She said she did not drink alcohol or use drugs that day, and never saw defendant using narcotics in her presence.  Defendant owned a hunting knife, over a foot long, that he carried around in a sheath, but Wilcox did not recall seeing him with it that night.  Defendant's white Ford pickup truck was parked on the property, some distance from the cabin.  Around 10:30 p.m., Wilcox recalled staying on a bed watching TV while defendant left the cabin while using her cell phone to talk with his brother.

. . .

Around 11:30 p.m. that night, Murray crossed the creek and came up to get a drink from a water hose outside Ortiz's shop.  In a dark area on the way back, he saw defendant (recognizing him by size and stature) walking his way.  He called out, "'Hey, how you doing, T.J .?'" but defendant did not answer.  This was odd and put Murray "on guard."  It was too dark to see well, but defendant kept coming.  Murray stopped, and the next thing he knew, was struck on the head.  He recalled one blow at trial, but had told a deputy sheriff that night he was struck twice.  He could not really see defendant swing anything at him but told the deputy it might have been a machete-type weapon.  He recalled raising his left arm to shield his head and his arm being struck.  Scared and stunned, Murray ran out to State Street, along one side of the property, yelling: "'Oh, fuck. What the hell just happened?  What the hell did you do that to me for?'"  Defendant remained silent.

The attack left Murray with cuts on his cheek and nose, and flesh gouged out of his left forearm.  He retreated for awhile, to gain composure, decide what to do, and how to safely circle back to the property to get medical help.

Meanwhile, sometime after 11:00 p.m., Ortiz was out in his shop with his brother and two people who had come to pick up a car . . . .

As Ortiz knelt by a car sanding it, defendant entered the shop, walked straight toward him with a machete and, without saying anything, struck him hard with it.  Two blows connected before Ortiz's brother intervened with a lamp to ward off the blows.  Ortiz was able to evade more blows, but the first one opened a seven-inch cut on his face, and the second hit him in the wrist, leaving him with no feeling in that hand.  He was sure that, without Acosta's help, he would have been decapitated.  Acosta escaped injury, although defendant swung the machete at him, too.  Defendant ceased his attack suddenly and walked out of the shop, toward his cabin, still having said nothing.  Ortiz bled profusely and was convinced he would die.  He left the shop, ranting and wanting to do harm to defendant. He yelled, "We are going to finish this," but only managed to throw a stick.  Wilcox came out of the cabin and kept herself between the men.  Then she and defendant went into the cabin.

Wilcox had been roused by defendant appearing at the doorway and then screams from a woman at the shop. Defendant had a terrified look, held the hunting knife in one hand, and said something like: "'Better leave.  The cops will be coming.  Something bad happened.'"  Hearing the woman scream, Wilcox pushed past him, went out to a parking area near a pump house under a light, and pushed defendant back to keep herself between him and the bloodied Ortiz, who was threatening to kill him.  Ortiz would

lunge at defendant, and defendant assumed a fighting stance behind her .
. . .
. . .

When paramedics arrived, Murray was taken by ambulance to a hospital and treated that night, receiving sutures on his nose, cheek and hand. Nearly two years later, at trial, he had scars on his face, arm and hand, and had not followed through to obtain a recommended skin graft for his arm. Ortiz, more seriously hurt, was treated first at a hospital in Ukiah and then flown by helicopter to one in Sacramento for a few days. At trial, he was still being treated for his injuries, had residual numbness in his hand and, from the trauma to his head, dizziness, forgetfulness, serious memory trouble, and an incomplete memory of what had happened that night.
. . .

Sheriffs found defendant's truck the next morning at a boat ramp on Lake Mendocino, and Deputy Raymond Hendry found defendant sitting on a nearby bench, between 7:00 and 8:00 a.m., and spoke with him. Defendant wore a beanie and, underneath it, a sheet of tin foil.  He told Hendry something like, "I knew you would find me."  When defendant stood up without honoring a request to show his hands,  Hendry forced him to the ground, handcuffed him, and searched him and a jacket. Finding no weapon, he asked where the knife was, and defendant said it was in the lake.  Defendant said he had gone out on a drift log, dived under the water and stuck it in the dirt on the lake bottom. The deputy figured this would have been 20 to 25 feet offshore but was unable to locate the knife.

It was stipulated that an analysis of blood drawn from defendant on the day he was apprehended revealed the presence of marijuana.

## B.  Sanity Phase

The court heard from psychiatrist Donald Apostle and clinical psychologist John Podboy, each called by the defense, and forensic psychologist Tom Cushing, called by the prosecution.  Each of them had examined defendant, and their expert qualifications were stipulated.  Preliminarily, reading specialist Katherine McCarthy, who worked with high school students, testified that she gave defendant a commonly used reading assessment test that showed him able to read without difficulty, if assisted, at a second grade level and likewise able to read at levels between third and fifth grade.  With eighth-grade-level material, however, he had only 50 percent comprehension, and was at his "frustration level."

**Donald Apostle.**  Apostle found defendant to have a flat affect and little range of emotion, but able to give "a fairly good history" of what went on at the time of the offenses.  Working also from competency reports by Dr. Rosoff and Kevin Kelly, prepared at Napa State Hospital (Napa), where defendant spent about seven months to gain trial competency (§ 1368), Apostle found defendant to be of average intelligence but with a very marginal educational level or capacity to develop his thoughts.  He seemed to have gained insight about what he had done during his time at Napa, reporting that it took him a long time there "to realize how crazy he was."  He had been diagnosed there as having methamphetamine-induced psychotic delusional disorder "of long-standing duration" that was in remission in the institutional setting.  He surely had

United States District Court

For the Northern District of California

acute symptoms when admitted.  He took Celexa and Trazodone, drugs that probably enhanced, rather than interfered with, his cognitive functions, and he responded appropriately.  Apostle did not see it himself, but defendant reported having intermittent auditory hallucinations.

Defendant reported his own background, but Apostle also had written statements from family members. He concluded that defendant had led a tragic life, exposed at an early age to cooking, making, smoking and using methamphetamine, physical and sexual abuse, little guidance, no boundaries, and 23 years of methamphetamine abuse.  Vague reports were that, at the time of the attacks, defendant had been off methamphetamine for perhaps two weeks, which would cause depression, and had been ingesting Jimsonweed (datura stramonium) from the yard as a way of dealing with the withdrawal, perhaps contributing to further toxic delirium and psychosis.  The blood draw had shown just marijuana, but it would have been hard to test for Jimsonweed.  Methamphetamine and hallucinogens such as LSD and ecstasy, all of which he had taken, produce neuronal death—the death of brain cells—causing "significant problems with his brain anatomy."  He had also abused prescription medications, marijuana and alcohol, over time creating cognitive dysfunction and impaired ability to maintain boundaries and appropriate personal interactions, even without the drugs.

Apostle believed that defendant was "incredibly psychotic for weeks" at the time of the attacks, suffering a panoply of "incredible delusions, hallucinations and thought insertion, bizarre delusional beliefs, ideas of reference."  Even at the time of striking the victims, "he was on the phone with his family in Minnesota thinking that they were even being attacked." He thought he heard messages from radio stations and background noises, and that people were having objects inserted up their rectums.  He wore tin foil over his head to protect himself from some kind of rays and bombardment, thought he had ESP, and was hiding under mattresses (even after his arrest) to protect himself from other kinds of rays and gunshots.  He projected fears and paranoia onto his environment and attacked people that night.  In fact, he had attacked someone six days before then, "thinking he was God and that they were somehow influencing a neighbor of his.  It was only when the woman finally screamed and said, 'What are you doing' that he sort of came to his senses and he began to bow down and apologize and claim[ ] he was a schizophrenic."  He was "very ill"—"one of the most sickest people" (sic) Apostle had heard of in a long time, and Apostle had 34 years of experience in making these evaluations.  Friends and acquaintances wrote of defendant being paranoid and delusional for years, and "totally unpredictable in [his] ability to be in touch with reality.  Sometimes he looked okay[,] and other times he was just sort of just totally out of it.  So this was going on for years."  Defendant believed that Ortiz had put sugar in his gas tank and felt jealous about him and Wilcox.  Wilcox had testified that he was just watching TV before the attack: "[B]ut he was also hearing voices.  He was listening to clicks and sounds from the TV announcers getting ideas of reference.  There were ... very poor boundaries between h[im] and the TV set.  So I think her ... interpretation of it I have no quibble with.  But on the other hand, if you were able [to] sit down with him at that time and somehow could have done an examination about what on earth he was watching and what he was receiving on that television set, I think he was quite psychotic."

**United States District Court**

For the Northern District of California

Apostle ultimately diagnosed a fixed severe psychotic delusional disorder (in Axis I terms, amphetamine-induced psychotic disorder with delusions). He did not consider defendant schizophrenic; any schizoid features were "way down the list in terms of their importance." He stressed repeatedly the cause being long-term drug use. It was: "consistent with long-term abuse of the methamphetamine," a result of long-term use of methamphetamine "and other drugs," a drug-induced psychosis, impaired mentation of "probably some organic brain syndrome secondary to all of this drug abuse over the years as well," with "paranoia" and "delusional ideation" lasting "even when the methamphetamine is no longer in the system." One exchange, on being asked whether the paranoia was attributable to methamphetamine abuse, was: "A. I think so. [¶] Q. As opposed to another mental defect or disorder? [¶] A. Well, you know, the other drugs that are thrown in there and, you know, these things reinforce." Defendant was "acutely and chronically psychotic, paranoid secondary to chronic drug ingestions," and asked again whether it was a drug-induced psychosis, he elaborated: "I think so over the long run. But I think it turned out to have a life of its own over time. I think ... he just became more of a psychotic, almost delusional person." He could appear directed and lucid, "But I wish I had a way of somehow sitting inside his brain at those moments because I think he's crazy most of the time." Apostle's DSM diagnosis was " 'Amphetamine-induced psychotic disorder with delusion,' " but "I think he also has hallucinations and—and brain damage and—on a chronic basis, yes."

Defendant was, in Apostle's view, insane under the *M'Naughton* test. "Certainly he had some knowledge that he [held a machete and] was attacking people, but this was based on faulty assumptions, psychotic assumptions and in a messed-up, severely psychotic state. I don't think he had any idea about the rightfulness or wrongfulness of his act." Much in the facts did show knowledge of right and wrong—telling Wilcox he had done something terrible, telling her the police were coming and that she should leave, taking the knife with him in the truck, disposing of it in the lake, staying away, and telling a deputy that he knew they would find him. In Apostle's view, however, this was a sudden and partial realization, much as in the assault six days earlier, where he seemed to come to his senses in the middle of psychotic behavior, and did not mean that he understood the wrongfulness of his earlier acts. Defendant "was psychotic all along. I think he was psychotic in terms of his delusional belief system and what was going on and he went to get this machete and he was going to take care of business because he thought his friends were being harmed and all this other stuff was going on in his head that was a misperception of reality. I think the—the awareness of what he finally did had some impact on him, to be sure. I think he did want to then go take care of that weapon and maybe even take care of himself." "Somehow he was able to ... pull himself together afterwards and say, 'Oh, my God, I've done something wrong.' In fact, when he went off to the lake ..., he was going to go kill himself." Another explanation was this: "This is not like a light switch that goes off and on. This is not like somehow he's lucid and then he's in the dark again. I think it's really a baseline, very, very marginal. And there are time's when ... reality raises his head and he says, "Oh, my God, I really blew it this time.' And then he—but he can't. He can't keep that up. I mean, he's just too disturbed."

**John Podboy.** Defendant's second expert held similar views. Podboy had given defendant no reading or psychological test tests but had

interviewed him for a couple of hours and, based as well on materials from Napa, interviews with acquaintances, and reports by Apostle and Cushing, agreed "for the most part" with the Napa diagnosis of amphetamine-induced psychotic disorder with delusions, polysubstance dependence and institutional remission.  Podboy only questioned whether one could be truly in remission at Napa given possible availability of drugs there.

Podboy held a less sanguine view than Apostle of defendant's intelligence.  He saw "subnormal" intelligence and "very abnormal," "truncated" affect.  Defendant, he said, did not know his height, weight or age.  He deemed him an "impaired historian" yet, like Apostle, credited defendant's accounts of personal history.  Since he thought defendant might read at a second to fourth grade level but was "essentially illiterate" (believing he completed only the first grade), he deemed use of the Minnesota Multiphasic Personality Inventory (MMPI) test (with an eighth-grade protocol) inappropriate and would "totally discount" its results.  He deemed defendant "untestable," generally, because he was "absolutely brain damaged" (neuropsychologically damaged).

Podboy, like Apostle, found the cause of that damage to be long-term abuse of drugs, particularly methamphetamine, and he stressed that it was permanent, untreatable damage.  "[H]e was a chronic drug abuser.  I felt that he was someone who abused both in his cognition and also in terms of his affect.  I felt that he was so seriously brain damaged that his condition is irreversible.  There's nothing that can be done about it.  There's no medication and there's no treatment.  And when I saw him, he was taking an antipsychotic medication and an antidepressant medication.  But nonetheless, he was obviously psychotic.  He told me about responding to internal stimuli, hallucinations and how he would chant to deal with them, his coping mechanism that he developed, and he ... was doing that in custody he told me."  "And I'm not trying to fault Napa State Hospital or anybody else," he explained, "He's done this to himself."  Defendant had abused drugs "for many, many years.... And he deteriorated over time to the point where he became not only detached or disconnected from reality[,] where he was psychotic, but he was also delusional about many different things.  It was a paranoid type of delusion.  I think he wore a tin foil cap or something shaped into a cap over his head to keep some sort of electrical rays from bombarding his central nervous system.  [¶]  He referred to some Nazi machine that made your head larger or your brain larger.  He was someone who began to speak of himself in the third person at times, stating to me, 'I don't know how he could have done that' or 'Wasn't he crazy then,' that sort of thing. [¶]  He had some concerns about friends and neighbors who were going to do bad things to him.  Here it is.  There was a Nazi machine to make your head bigger, and apparently at some point he was ... trying to find this machine.  But I—in my opinion, I felt that he was totally psychotic at or about the time of these allegations."  He had been psychotic for years, was psychotic "today as we sit here in this courtroom," and this was not "changeable."  He had "damaged himself irretrievably due to decades of methamphetamine abuse, and in so doing, developed a delusional disorder from which" he had not recovered.  He was "one of the most disturbed people I have seen in my career."  Podboy spoke of a long-standing underlying mental disorder, but did not believe there was another mental disorder or defect "other than amphetamine induced

1    psychotic disorder."

2    Nevertheless, one can function in a psychotic state and not appear
3    deranged.  Thus, he was able to drive a car and take care of his daily
     needs.  Defendant was insane as he committed the acts, Podboy opined.

4    Podboy ultimately concluded that defendant did not understand "the
     nature and quality of his acts" at the time of the assaults, one component
5    of the *M'Naughton* test of insanity as long used in California (*People v.
     Kelly* (1973) 10 Cal.3d 565, 574 (Kelly)).  We see nowhere in his
6    testimony, however, where Podboy rendered a direct opinion on whether
     defendant appreciated, at the time of his acts, their rightfulness or
7    wrongfulness, the other component of the test (*ibid.*).  This left the court
     without any direct testimony by him on the knowledge-of-wrongfulness
8    component, something the court did not mention in its ultimate sanity
     ruling.  The court, however, could have drawn inferences from one place
9    in the transcript where Podboy responded, when asked whether
     defendant's acts of telling Wilcox the police were coming and then getting
10   rid of the weapon showed psychosis, acts Podboy had just conceded were
     not inherently consistent with psychotic behavior.  Podboy replied: "Yes,
11   because another part of that, a parallel process is that he was convinced
     [of] the rightfulness of what he did.  Certainly it was legally wrong and
12   morally wrong, but his own internal values and perspective on the world
     and his life justified everything that he did."
13
     Podboy conceded that many of defendant's acts did not intrinsically
14   indicate psychosis, and could normally indicate guilty knowledge or
     knowing what he had done—like telling Wilcox he had done something
15   wrong and that the police were coming, telling law enforcement the next
     day he knew they were coming, writing a letter to Ortiz asking him not to
16   testify so he would not have to go to prison, and disposing of the weapon
     in the lake.  Podboy's most direct answer came when asked if this meant
17   he thought defendant was passing in and out of psychosis: "No," he said:
     "I think he was psychotic throughout that period of time.  And I appreciate
18   the precision of ... your questioning.  But as I testified to earlier, I think the
     backdrop to all of this was the fact that we had at that time a brain
19   damaged individual who had been psychotic for a long time, for years, and
     concurrently was also delusional.  And there were behaviors that he
20   engaged in, as you pointed out, that any one of us might have engaged in
     if we were so prone to criminal misconduct. [¶]  But I think when we take
21   all ... that I've been able to pull together about this individual, there is an
     unmistakable psychotic trajectory to what he did [from start to finish]."
22
     **Tom Cushing.**  Cushing used much the same source material and
23   interviewed defendant for more than five hours over three sessions, the
     first session using 90 minutes of two-plus-hours administering an MMPI
24   test.  Most of defense counsel's extensive cross-examination consisted of
     questioning the administration and ethical propriety of using the MMPI test
25   on defendant, given his intelligence and reading abilities.  Cushing,
     however, said he used the test "routinely" in making forensic assessments
26   of this type (citing §§ 1026, 1027, subd .(b)), which he had been doing for
     32 years.  He also had more positive assessments of defendant's affect
27   and reading ability than his fellow experts.  He found defendant to be very
     cooperative, sequential in delivering information, off by just a year in giving
28   his age as 30 (it being 31), able to give the dates he spent at Napa,

appropriately interactive, not preoccupied, having a flat and somewhat depressed (but not blunted) affect, and very appropriately engaged, making eye contact over 50 percent of the time.  Defendant told him he had been in special education classes and dropped out of school halfway through the ninth grade, but later acquired his high school equivalency certificate (GED) through the California Conservation Corps.  He had also been able to pass tests for his driver's and commercial driver's licenses. Defendant reported no hallucinations during the sessions and exhibited no such behavior.  Cushing felt (without formal testing) that defendant manifested gross normal (i.e., low average to average) intelligence. Cushing acknowledged defendant's early sexual abuse and "sad" dysfunctional family upbringing, plus long use of methamphetamine, plus LSD, ecstasy and marijuana.  There was no notable abuse of alcohol, or any history of prior psychiatric hospitalization.

. . .

MMPI results do not give diagnoses but, rather, data about consistencies with persons having particular diagnoses.  The results here showed responses consistent with someone experiencing considerable anxiety, tension and depression, i.e., diagnoses of anxiety disorder, dysthymic disorder, or schizoid personality disorder.  The responses reflected acknowledgment of ongoing drug problems, but also unusual and somewhat bizarre ideas—responses not similar to a psychotic disorder, but consistent with reported behaviors and conduct while defendant was housed in the general population in county jail.  Jail staff had reported to Cushing that defendant was not demonstrating behavioral problems, was completely appropriate for the general population, was not in seclusion or restraints, and was not a problem inmate.  Those experiencing methamphetamine-induced psychotic disorder with delusions—Cushing's ultimate conclusion for defendant at the time of the offenses—are commonly very disruptive in a jail setting, both with other inmates and staff.  In Cushing's view, defendant had improved but was "not fully recovered" and, while he no longer showed "overt signs or symptoms" of a psychotic disorder, still exhibited some unusual or bizarre ideas.

Cushing also assessed defendant on a global assessment scale (GAF), giving him scores of 35 at the time of the assaults and 60 when he interviewed him.  These reflected a scale of 1 to 100, with 1 being the absolute worst and 100 the ideal best.  The 35 score indicated some psychotic presentation plus partial impairment of reality.

Cushing concluded that defendant suffered at the time of the attacks from the mental disease/disorder of substance-induced psychotic disorder (primarily methamphetamine) with delusions, polysubstance dependence, now in institutional remission.  Secondarily, he felt the symptoms were the result of ongoing ingestion and then withdrawal from methamphetamine coupled with Datura ingestion, which can cause hallucinations and delusions.  Withdrawal referred to defendant having ceased using methamphetamine shortly before the attacks, and Datura referred to reports that defendant was eating the plant's flower (that very day, he told Cushing).  Withdrawal does not stop the symptoms of long-term methamphetamine abuse; it may even enhance them.  The blood test did not show use of Jimsonweed, but the test did not address that use. Further report language that the disorder was "the result of self-ingestion and not the result of long-standing underlying mental disorder, per se,"

9

1   was ill-phrased but meant that there was no "other underlying mental
2   disorder along with the substance-induced psychotic disorder."  His
    opinion roughly coincided with the conclusions of the other experts, and
    was consistent with language in the Napa reports (which dealt with the
3   different issue of competence to stand trial).  FN5

4       FN5. Cushing felt there was a very good chance that defendant
        also suffered from posttraumatic stress disorder (PTSD), but he did
5       not deem that a primary diagnosis.

6   In spite of that mental disease/disorder, Cushing concluded that defendant
    did understand the nature and quality of his act, meaning he had a basic
7   understanding of where he was, what was going on and what he was
    doing.  This was shown by his ability to "describe what he did with the
8   knife before, during and after the offense."  Only a "very, very rare"
    individual would lack such awareness.  Defendant was aware that, "by
9   swinging a knife at someone, it could cause harm"; he held no illusion that
    the knife was, say, "a magic wand" that would transport the victim "to
10  some wonderful state...."

11  On the alternative *M'Naughton* question of whether the mental disease or
    disorder rendered defendant unable to appreciate the moral or legal
12  wrongfulness of his actions, Cushing expressed no opinion in his report.
    He did not reach the question because he understood, under California
13  law, that if, as he concluded, the disease/defect was caused by abuse or
    addiction to drugs, the effect was irrelevant because the condition itself did
14  not qualify for insanity.  Nevertheless, offering an opinion for the first time
    in testimony, Cushing felt that, in spite of his condition, defendant "did
15  know and understand that his act was morally or legally wrong."  His
    statements, conduct and behavior during and immediately following the
16  offense were not consistent with someone who was psychotic.

17  **Argument.**  Before hearing final arguments, the court asked the parties to
    come prepared to specifically address the issue, highlighted in Cushing's
18  testimony of whether current law removed from legal insanity a mental
    disease or defect caused solely by use of or addiction to drugs.  The
19  parties did so, arguing that issue at length before the court ruled.

20  **Ruling.**  The court referenced standard jury instruction CALCRIM No.
    3450 in ruling: "The two issues that need to be addressed are defined as
21  follows: One, when he committed the crime or crimes, he had a mental
    disease or defect.  And two, because of that disease or defect, he did not
22  know or understand the nature and quality of his act or did not know or
    understand that his act was morally or legally wrong.  [¶]  I tend to agree
23  that the experts who testified certainly all seemed to conclude that
    because of a disease or defect he didn't know or understand the nature or
24  quality of his act or did not know or understand that his act was morally or
    legally wrong."
25
    The "real issue" before it, the court stated, was the
26  mental-disease-or-defect prong as limited by bracketed language in the
    instruction for conditions caused solely by abuse of or addiction to drugs
27  or alcohol, or organic brain damage or settled mental disease lasting after
    the immediate effects of such intoxicants have worn off (language quoted
28  in fn. 6, post).  The court said: "[I]t is often the case ... that hearing cases

such as this, your heart may go one way and the law may go another. And in this particular case, it has been suggested by apparently the self-reporting of the defendant to various experts that his addiction started at a fairly early age and was to some extent the result of conduct by his parents. I'm not convinced based on the self-reporting in and of itself that that is of sufficient strength to conclude that his long-term use of amphetamine and his addiction is necessarily involuntary. [¶] The other point that has struck the Court is that ... the Court has found and it was stipulated by the parties that [the three experts are] qualified. And I've heard many of these experts before, and I frankly know them to be qualified and we obviously to some extent have a differing point of view that the experts have offered. But the common theme that appears to have run throughout all the opinions is that the defendant's mental disease or defect was described as an amphetamine-induced psychosis. [¶] Now, I don't recall any of the doctors proffering another Axis I diagnosis or any other mental disease or defect that combined with that to explain their conclusion that he was legally insane. And obviously, there's a substantial difference between someone who's medically insane and someone who's legally insane."

The court concluded: "This is one of those cases where my heart is telling me one thing, but the law is directing me to conclude that the defense has not met their burden of proof that the defendant was legally insane at the time—and I emphasize that, legally insane at the time of this offense, and that's the Court's conclusion."

*Pelfrey*, 2011 WL 63084 *1-12.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case

United States District Court

For the Northern District of California

1   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

2   *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application

3   of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

4   identifies the governing legal principle from the Supreme Court's decisions but

5   "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The

6   federal court on habeas review may not issue the writ "simply because that court concludes

7   in its independent judgment that the relevant state-court decision applied clearly

8   established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must

9   be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

10      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

11   determination will not be overturned on factual grounds unless objectively unreasonable in

12   light of the evidence presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at

13   340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

14      The standard of review under AEDPA is somewhat different where the state court

15   gives no reasoned explanation of its decision on a petitioner's federal claim and there is no

16   reasoned lower court decision on the claim.  In such a case, as with the majority of claims

17   in this petition, a review of the record is the only means of deciding whether the state

18   court's decision was objectively reasonable.  *Himes v. Thompson*, 336 F.3d 848, 853 (9th

19   Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  When confronted with

20   such a decision, a federal court should conduct an independent review of the record to

21   determine whether the state court's decision was an objectively unreasonable application of

22   clearly established federal law.  *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

23

24

25

26                              **DISCUSSION**

27      As grounds for federal habeas relief, Pelfrey asserts that his attorney was ineffective

28   in that he: (1) waived a jury trial; (2) failed to present a mental defense to the "intent to kill"

United States District Court

For the Northern District of California

1  element of attempted murder during the guilt phase; (3) was unaware of a California case

2  that made the insanity defense unavailable under the facts as counsel presented them; (4)

3  failed to discover evidence of causes of petitioner's mental difficulties other than his long-

4  term drug use; (5) failed to present expert testimony about these other causes of

5  petitioner's mental difficulties; and (6) failed to investigate and present additional facts at

6  sentencing.

7  **I.    Ineffective Assistance of Counsel**

8         A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

9  Sixth Amendment right to counsel, which guarantees not only assistance, but effective

10 assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The

11 benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

12 undermined the proper functioning of the adversarial process that the trial cannot be relied

13 upon as having produced a just result. *Id.*

14        In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

15 must establish two things. First, he must establish that counsel's performance was

16 deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing

17 professional norms. *Strickland*, 466 U.S. at 687–88. Second, he must establish that he

18 was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable

19 probability that, but for counsel's unprofessional errors, the result of the proceeding would

20 have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to

21 undermine confidence in the outcome." *Id.*

22        The *Strickland* framework for analyzing ineffective assistance of counsel claims is

23 considered to be "clearly established Federal law, as determined by the Supreme Court of

24 the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *Cullen v. Pinholster*,

25 131 S. Ct. 1388, 1403 (2011). A "doubly" deferential judicial review is appropriate in

26 analyzing ineffective assistance of counsel claims under § 2254. *See id.* at 1410–11. The

27 general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great

28 deference, gives the state courts greater leeway in reasonably applying that rule, which in

United States District Court
For the Northern District of California

turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

To demonstrate deficient performance, a petitioner is required to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687.

Claims one through five in the petition were presented in a state habeas petition and denied by the California Supreme Court without a reasoned opinion.  Answer, Exhs. 17, 19.  The court will therefore conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Delgado*, 223 F.3d at 982.

**1.    Jury Trial**

Pelfrey contends that trial counsel was ineffective in advising him to waive a jury for the guilt and sanity trials.

The record does not reflect why a jury trial was waived or if trial counsel did indeed advise that course of action or if Pelfrey preferred a court trial.  An unsigned declaration from trial counsel is included with the petition but does not discuss the decision to waive a jury.  Petition Exhibits at 93-94.[2]  After a review of the record, the court finds that Pelfrey has failed to demonstrate that trial counsel was deficient or that he was prejudiced.

Pelfrey presents declarations from a psychiatrist and a psychologist, both of whom testified at trial and state that he would have had a better chance with a jury.  Petition Exhibits at 67, 86.  However, a difference of opinion as to trial tactics does not constitute denial of effective assistance, *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.

---

[2] Due to inconsistent page numbering in the exhibits attached to the petition, the court has referred to all page numbers of the exhibits as they appear in the court's electronic docket.

United States District Court

For the Northern District of California

1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984).

Pelfrey argues that the facts of the case were not particularly gruesome so a jury would not have been shocked. However, unprovoked, Pelfrey attacked two men with a machete inflicting serious injuries that were still visible and being treated at the time of trial. Pelfrey also contends that his physical appearance would have aided his cause in a jury trial. Petition at 65. Pelfrey supports this argument with descriptions of his appearance several years before trial. Petition Exhibits at 52. Yet the same exhibit that describes Pelfrey's pleasant appearance several years prior to trial also describes him at a time closer to trial as "filthy, smelled strongly of body odor, dressed in dirty clothes. . .". *Id.* at 54. Pelfrey was originally deemed incompetent and described in an evaluation as making an "extraordinarily poor impression with respect to competency from the start. [Pelfrey] reeked of body odors including vomit. Food and vomit was strewn throughout his hair. His hair was long and matted. His jump suit was unbuttoned and heavily soiled." *Id.* at 26.

During the sanity trial, Dr. Podboy testified, "And as I sit here today and watch him, he seems to be not particularly sensitive to what it is that I'm saying. At times he's mouthing words as I look at him. He could be hallucinating as -- as he sits there." Reporter's Transcript ("RT") at 282. Later, Dr. Podboy testified that Pelfrey, "is sitting here chanting, he tells me. He's moving his lips. He's disconnected from what's going on right now." RT at 312.

Trial counsel could have reasonably determined that it would not have been in Pelfrey's best interest to have a jury observe him and his behavior during trial. Pelfrey has failed to demonstrate deficient performance and prejudice or that the state court denial was an unreasonable application of *Strickland*. Trial counsel made a reasonable tactical decision, and there is no indication that a jury trial at the guilt or sanity phase would have resulted in a different outcome. This claim is denied.

**2.      Mental Defense at Guilt Phase of Trial**

United States District Court
For the Northern District of California

Pelfrey next argues that trial counsel was ineffective for failing to present a mental defense at the guilt trial that Pelfrey could not have had the intent to kill due to his long-term use of methamphetamine.  Petition at 60.

Background

A California defendant is permitted by Cal. Penal Code § 1026 to plead both "not guilty" and in the alternative "not guilty by reason of insanity."  Insanity is not an element of any crime, but rather "is a plea raising an affirmative defense to a criminal charge," separate and independent from the elements of any underlying crime.  *People v. Hernandez*, 22 Cal. 4th 512, 522 (2000).  Defendants who enter both pleas have two chances to avoid criminal punishment.  The guilt and sanity phases are tried separately in bifurcated proceedings, but they are part of a single trial.  *See Knowles v. Mirzayance*, 556 U.S. 111, 114-15 (2009).

"In the first phase, the defendant's guilt is determined without reference to his plea of insanity."  *Patterson v. Gomez*, 223 F.3d 959, 964 (9th Cir. 2000) (footnote omitted). "[E]vidence of mental disease, defect or disorder is not admissible to show diminished capacity per se, but it is admissible to show whether a particular defendant actually had the mens rea required for a specific intent crime[.]"  *Id.*, at 965, n. 4; Cal. Penal Code § 28(a). "If defendant is found guilty, the trial goes on to a second phase in which his legal sanity is determined."  *Patterson*, 223 F.3d at 964. The sanity trial is similar to a determination of "guilt" only insofar as "a successful insanity plea relieves the defendant of all criminal responsibility."  *People v. Jantz*, 137 Cal. App. 4th 1283, 1295 (Cal. App. 2 Dist. 2006).

California law also provides that, "[i]n any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an *addiction to, or abuse of, intoxicating substances*."  Cal. Penal Code § 29.8 (formerly § 25.5) (emphasis added).

Analysis

During the guilt phase, trial counsel argued that the testimony of the victims was

United States District Court

For the Northern District of California

1   inconsistent and challenged their version of events.  RT at 189-95.  There was also

2   testimony that Pelfrey did not use controlled substances on the day of the assault.  RT at

3   57.  Later, during the sanity phase, trial counsel argued that there was no proof Pelfrey was

4   using jimson weed.  RT at 429.  A review of the record suggests that trial counsel was

5   stressing that Pelfrey was not using drugs so that at the sanity phase he could argue that

6   Pelfrey was insane, but not as a result of voluntary intoxication which would be problematic

7   in light of Cal. Penal Code § 29.8.  RT at 427-33.  This strategy was a reasonable tactical

8   decision based on California law.

9        Pelfrey argues that during the guilt phase, trial counsel should have presented

10   testimony regarding Pelfrey's long term-use of methamphetamine that caused brain

11   damage, which would prevent him from forming the intent to kill.  Petition at 60-61.  While

12   trial counsel could have pursued this strategy, Pelfrey has failed to show that counsel was

13   deficient for focusing on mental health issues at the sanity phase of trial and that the

14   outcome would have been different had the methamphetamine use been raised at the guilt

15   phase.  Pelfrey argues that he could have been reacting to delusions and thought he was

16   being attacked.  Petition at 62.  This contention is contradicted by the record which

17   indicates Pelfrey approached the victims and attacked them with a machete, and Pelfrey

18   was previously jealous of the interactions of his girlfriend with one of the victims.

19        Pelfrey also argues that there was nothing to lose by employing this strategy and

20   that trial counsel was ineffective for failing to pursue it.  However, this is not a situation

21   where trial counsel neglected to address Pelfrey's mental state.  While trial counsel focused

22   on the evidence of the assault during the guilt phase, the sanity phase involved an in-depth

23   look at Pelfrey's mental health with several expert witnesses testifying.  Trial counsel

24   focused on Pelfrey's sanity during the sanity phase of trial, and Pelfrey has not shown that

25   this strategy was deficient or that he suffered prejudice as a result.  His conclusory

26   allegations that more emphasis should have been placed on forming the intent to kill during

27   the guilt phase is insufficient to warrant habeas relief in light of the high standard set by

28   *Strickland* and *Harrington*.

1

**3.**   *People v. Robinson*

2    Pelfrey argues that trial counsel was ineffective for being unaware of *People v.*

3  *Robinson*, 72 Cal. App. 4th 421 (Cal. App. 5 Dist. 1999), and its holding regarding Cal.

4  Penal Code § 25.5 (now § 29.8) that an insanity defense cannot be based solely on the

5  voluntary consumption of intoxicants.   In support of this claim Pelfrey includes an unsigned

6  declaration from trial counsel stating that he was not aware of *Robinson*.   Petition Exhibits

7  at 93-94.   The declaration was however, prepared by appellate counsel and sent to trial

8  counsel to be signed if it was accurate, but no response was received.   Petition Exhibits at

9  74-75; Answer Exh. 17 at 50, n. 20.   Thus, no signed declaration has been provided to the

10  court and, more significantly, the claim is contradicted by the trial record.

11    Prior to closing arguments the trial court specifically requested that both parties

12  address this issue either orally or in writing.   RT at 416.   The trial court noted that addiction

13  or abuse of intoxicants by itself does not qualify as legal insanity and cited *Robinson*.   RT at

14  416-17.   During closing arguments trial counsel discussed *Robinson* and its implications at

15  length and argued that the testifying doctors still believed Pelfrey legally insane despite

16  *Robinson*.   RT at 427-30.   Trial counsel stated:

17       The *Robinson* case is not new.   The doctors have hundreds of reports
         between them since those cases became part of our jury instructions.
18       . . .

19       But both Dr. Apostle and Dr. Podboy referred to 1026 and 1027, referred to it
         in their testimony, and said this person meets the guidelines.   The People
20       have to argue that those doctors with that experience don't know about the
         existence of the bracketed paragraph of *People v. Robinson.*   I pose to the
21       Court that's preposterous, flat out preposterous that they are unaware of that.

22  RT at 427-28.

23    In support of his arguments that Pelfrey was insane despite the drug abuse, trial

24  counsel discussed Pelfrey's early sexual abuse, dysfunctional family and that he was

25  introduced to methamphetamine at an early age.   RT at 428, 431.   One of Pelfrey's expert

26  witnesses also stated that Pelfrey was the victim of physical abuse as a child.   RT at 237.

27  Trial counsel's statements and the evidence he presented do not reflect that he had only

28  recently become aware of *Robinson*.   As the record demonstrates that trial counsel

United States District Court

For the Northern District of California

1    addressed the *Robinson* issue and because Pelfrey's only support for this claim is

2    unsupported allegations, Pelfrey cannot show ineffective assistance of counsel.  Thus, this

3    claim is denied.

4          **4.      Investigation of Contributing Causes of Insanity**

5          Pelfrey alleges that counsel was ineffective for failing to investigate and discover

6    additional information regarding Pelfrey's background, other than methamphetamine use,

7    that would have supported the insanity claim.

8          Background

9          Expert testimony is necessary when lay persons are unable to make an informed

10   judgment without the benefit of such testimony.  *See Caro v. Calderon*, 165 F.3d 1223,

11   1227 (9th Cir. 1999).  If experts need to be consulted, counsel must provide the experts

12   with information relevant to the conclusions of the expert.  *See Caro*, 165 F.3d at 1227.

13         Absent a request for information from an expert, counsel does not have a duty "to

14   acquire sufficient background material on which an expert can base reliable psychiatric

15   conclusions . . . ."  *Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th Cir. 1997); *see, e.g.,*

16   *Turner v. Calderon*, 281 F.3d 851, 876-77 (9th Cir. 2002) ("Failure to provide a psychologist

17   with facts about a defendant's family history ordinarily cannot support a claim of

18   constitutionally ineffective assistance.").  Nor can counsel be faulted for failing to track

19   down every record that might possibly relate to the defendant's mental health.  *See Bloom*,

20   132 F.3d at 1278.  However, when the defense's only expert requests relevant information

21   that is readily available and counsel inexplicably does not even attempt to provide it,

22   presenting instead the expert's flawed testimony at trial, counsel's performance is deficient.

23   *See id*.

24         Analysis

25         Pelfrey states that he suffered sexual abuse, physical abuse, head and respiratory

26   injuries and traumatic stress which may have produced traumatic brain injuries and post

27   traumatic stress, which were contributing causes of his insanity that should have been

28   raised at trial.  Petition at 8.  However, at trial the experts testified regarding Pelfrey's

United States District Court

For the Northern District of California

childhood and history of physical and sexual abuse and early introduction to

methamphetamine that damaged his brain.  RT at 237-38, 270-72, 310, 335-36.  Counsel

provided the experts with many documents regarding Pelfrey's background including

transcripts of interviews conducted by the defense investigator, reports from doctors while

Pelfrey was at Napa hospital, sheriff's office reports, a forensic alcohol report and

interviews with several of Pelfrey's friends.  RT at 270-71, 329.  There is no indication that

the doctors who testified at trial requested or required additional information.

Pelfrey includes several declarations that were also included with the state court

habeas petitions.  However, the information provided does not greatly differ from what was

raised and discussed at trial.  Pelfrey's sister discusses his use of methamphetamine at a

young age and reports that he was physically and sexually abused.  Petition Exhibits at 12-

17.  As noted above these issues were discussed at trial.  Also included are new

declarations from Dr. Apostle and Dr. Podboy, both of whom testified at trial.  Neither

doctor reexamined Pelfrey before providing the declarations, but Dr. Apostle states that

based on this new information provided by the sister it is possible that Pelfrey's traumatic

experiences could have contributed to his insanity.  Petition Exhibits at 2.  Though at trial

Dr. Apostle was aware at least to some extent of this history.  At trial Dr. Apostle testified:

> Well, I think -- I think [Pelfrey] has led a tragic life.  He was from an early age
> exposed to issues that most children never exist and most adults never even
> have to face.  His exposure to cooking and making and smoking and using
> methamphetamine started at age nine.  His educational level is quite
> impaired.  He was not given much guidance.  There were no boundaries in
> his family.  There was sexual abuse.  There was physical abuse.

RT at 237.  Trial counsel also referenced the sexual abuse in his closing argument.  RT at

428.  Several reports also indicated sexual abuse and other abuse.  Petition Exhibits at 22,

41, 46

In his new declaration, Dr. Podboy also stated that there were contributing causes

and methamphetamine abuse was not the sole cause of Pelfrey's insanity.  Petition

Exhibits at 5.  Dr. Podboy states that these additional causes could have caused post

traumatic stress disorder, but Dr. Podboy was not aware of the previous traumatic

United States District Court

For the Northern District of California

1   experiences.  *Id.*  Though Dr. Cushing, who testified for the prosecution at trial and

2   reviewed much of the same materials as the other doctors, found that Pelfrey suffered from

3   post traumatic stress disorder.  RT at 341-42.

4   　　　The new information regarding Pelfrey's background does not greatly differ from

5   what was presented at trial, nor are there any allegations that the experts requested

6   additional information that trial counsel failed to provide.  That the experts later reviewed

7   additional information that may have changed their opinion does not demonstrate

8   ineffective assistance of counsel, who initially retained the experts.  Pelfrey has failed to

9   demonstrate that trial counsel was deficient or that he suffered prejudice because much of

10   the information was presented at trial.  Counsel presented two expert witnesses who

11   testified regarding Pelfrey's insanity, interviewed Pelfrey and reviewed a great deal of

12   background information.  While the trial court stated that finding Pelfrey not insane was a

13   close call, Pelfrey has not shown that trial counsel's performance was constitutionally

14   ineffective.  This claim is denied.

15   　　　**5.    Presentation of Contributing Causes of Insanity**

16   　　　Similar to the prior claim, Pelfrey argues that trial counsel was ineffective for failing

17   to present evidence of contributing causes to insanity other than methamphetamine use.

18   For the same reasons set forth above, this claim is denied.  As noted above, trial counsel

19   did present evidence of other factors that contributed to Pelfrey's insanity, including

20   physical and sexual abuse, and another doctor testified that Pelfrey suffered from post

21   traumatic stress disorder.  Moreover, Pelfrey has failed to show that any additional

22   evidence would have changed the outcome of trial.  As Pelfrey is unable to show deficient

23   performance or prejudice, this claim is denied.

24   　　　**6.    Failure to Present Mitigating Facts at Sentencing**

25   　　　Pelfrey argues that trial counsel was ineffective for failing to investigate and present

26   mitigating facts at sentencing.  This claim was not exhausted, however the court may deny

27   an unexhausted claim on the merits.  28 U.S.C. § 2254(b)(2); *Cassett v. Stewart*, 406 F.3d

28   614, 624 (9th Cir. 2005) (holding that an unexhausted petition may be denied on the merits

**United States District Court**
For the Northern District of California

1    when it is perfectly clear that the applicant does not raise even a colorable federal claim).

2        The Ninth Circuit has held that the Supreme Court has not decided what standard

3    should apply to counsel's performance in non-capital sentencing proceedings.

4    *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1244 (9th Cir. 2005), *cert. denied*, 546 U.S.

5    944 (2005).  *Strickland* declined to "'consider the role of counsel in an ordinary sentencing,

6    which . . . may require a different approach to the definition of constitutionally effective

7    assistance,'" and no later Supreme Court decision has done so, either.  *Id.* (quoting

8    *Strickland*, 466 U.S. at 686).  Consequently, there is no clearly established Supreme Court

9    precedent governing ineffective assistance of counsel claims in the noncapital sentencing

10   context.  *See Davis v. Grigas*, 443 F.3d 1155, 1158-59 (9th Cir. 2006); *Cooper-Smith*, 397

11   F.3d at 1244-45.[3]

12       Based on the existing Ninth Circuit and Supreme Court precedents, Pelfrey cannot

13   obtain habeas relief on this claim.  Even looking to the merits, Pelfrey's claim must be

14   denied.  Much of the information Pelfrey argues should have been discovered was already

15   part of the record, and Pelfrey's medical record was to be provided to the probation

16   department.  RT at 442-43, 447.  Most importantly, the trial court only imposed a mitigated

17   term of five years for the attempted murder, was legally required to impose three years for

18   the special allegation of great bodily injury, one year for use of a deadly weapon and a

19   consecutive term of four years with respect to the other victim.  RT at 462.[4]  While

20   ───────────────

21   [3] The court notes that several members of the Court of Appeals have issued concurring
     decisions questioning the vitality of *Davis* and *Cooper-Smith* due to the prior Supreme Court
22   case of *Glover v. United States*, 531 U.S. 198 (2001).  *See, e.g., Davis v. Belleque*, 465 Fed.
     Appx. 728 (9th Cir. 2012) (Paez, J., concurring) ("I write separately only to express my
23   agreement with Judge Graber's concurrence in *Davis* [ ] that *Strickland* [ ] applies to formal,
     noncapital sentencing proceedings.").
24       Nevertheless, in the absence of a change of law in this circuit or a clear statement from
     the Supreme Court, this court is bound to existing law.  *Nevada v. Jackson*, 133 S.Ct. 1990,
25   1991 (2013) (where "no prior decision of this Court clearly establishes" applicable constitutional
     rule, habeas relief unavailable); *see also Daire v. Lattimore*, 2012 WL 1197645 *3 (C.D. Cal.
26   2012) ("Irrespective of the proper interpretation of the Supreme Court precedents pertaining
     to ineffective assistance of counsel, this Court is bound by *Davis* and *Cooper-Smith* until they
27   are reversed en banc or by the Supreme Court.").

28       [4] The California Court of Appeal reduced the sentence to eleven years.

probation could have been imposed, that was not realistic based on the facts of the case, and Pelfrey did not receive the harshest sentence.  For all these reasons, this claim is denied.

## II.     Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that three claims presented by Pelfrey in his petition meet the above standard and accordingly GRANTS the COA.  *See generally Miller-El*, 537 U.S. at 322.

The claims are:

(1) whether trial counsel was ineffective for failing to present a mental defense at the guilt phase of trial;

(2) whether trial counsel was ineffective for failing to discover evidence of causes of Pelfrey's mental difficulties other than his long-term drug use; and

(3) whether trial counsel was unaware of *People v. Robinson*.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  Pelfrey is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

## CONCLUSION

1       1.  For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  A

2   Certificate of Appealability is **GRANTED**.

3       2.  The clerk shall close the file and also send a copy of this order to the parties of

4   record and Anthony Pelfrey #AA3102 at California Medical Facility.

5       **IT IS SO ORDERED.**

6   Dated: March 18, 2014.

                                                PHYLLIS J. HAMILTON
7                                               United States District Judge

8   G:\PRO-SE\PJH\HC.12\Pelfrey3857.hc.wpd

**United States District Court**
For the Northern District of California